Filed 11/2/22  P. v. Martinez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B316887 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA118790) |
| v. | |
| JESSE GEORGE MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Jesse George Martinez (defendant) of sexual penetration of a child (Pen. Code,[1] § 288.7, subd. (b); count 1 [victim E.J.]), lewd act on a child (§ 288, subd. (a); count 2 [victim J.V.]), and lewd act on a child (§ 288, subd. (a); count 3 [victim E.J.]), and the court sentenced him to 15 years to life in state prison.

On appeal, defendant contends that the evidence was insufficient to support the jury's conviction on count 3. He also contends that the prosecution was improperly allowed to present expert witness testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), and therefore his convictions on all three counts should be reversed. Finally, he contends the trial court failed to apply the correct legal standard on his motion for new trial, requiring at least a remand to have the court consider the motion under the correct standard.

We reject all of defendant's arguments and affirm.

## BACKGROUND

### I. The Information

In an information filed on August 20, 2019, defendant was charged with oral copulation/sexual penetration with child under 10 in violation of section 288.7, subdivision (b) (count 1) and lewd act upon a child in violation of section 288, subdivision (a) (counts 2 and 3).[2] Section 667.61, subdivisions (b) and (e) multiple victim

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] In the information, the counts were numbered 2, 3 and 4, and there was no count 1. The superior court later designated the count identified in the information as number 2 as "count 1," the count identified in the information as number 3 as "count 2,"

2

allegations were alleged as to counts 2 and 3. Counts 1 and 3 alleged violations occurring between May 22, 2014, and May 21, 2016, against E.J.; count 2 alleged a violation occurring on August 5, 2018, against J.J.

Defendant pled not guilty to all counts.

## II. The Trial

### A. *Prosecution Case*

#### 1. *E.J.'s and J.J.'s Family Was Close to Defendant's Family*

E.J. was born in 2008 and J.J. was born in 2012. Defendant was born in 1994. Defendant is known as "Junior."

Defendant lived with his parents, Rosa and Jesse Martinez, Sr.; his younger brother and sister also lived in the home. The Martinez family lived on the same street in Pomona as E.J. and J.J., and were very close friends with E.J.'s and J.J.'s mother, Blanca. Rosa and Jesse Martinez, Sr. were godparents to E.J. and J.J., and Blanca paid Rosa[3] to babysit J.J. E.J. and J.J. often spent time at the Martinez home.

#### 2. *E.J.'s and J.J.'s Mother Testifies*

According to Blanca, defendant was usually in his room when she and her daughters visited but he did play with the girls. Once, when E.J. was about eight, Blanca found her in

_____

and the count identified in the information as number 4 as "count 3." The parties refer to the counts as 1, 2 and 3, and we will do the same.

[3] Because we refer to several members of the Martinez family, we will occasionally use only their first names; no disrespect is intended.

3

defendant's room; the door was open, and defendant was hugging E.J. as she was standing between defendant's legs with her back to defendant. Blanca told E.J. that she did not like this. After this incident, Blanca continued to allow the girls to go back to the house, although she was mostly with them and they did not go back for a while after the incident.

On many occasions, Blanca had told her children to tell her if anyone tried to touch them inappropriately.

On August 5, 2018, E.J. and J.J. were at the Martinez house to have pizza. Blanca got home from work around 6:30 p.m. that evening. Soon after that, E.J. went home from the Martinez house; she told Blanca that J.J. did not want to come home, but did not say why. E.J. changed her clothing and told Blanca that she had wet herself when defendant tickled her. Blanca thought it was normal for that to occur and was not troubled by it. Blanca told E.J. to bring J.J. home.

E.J. returned with J.J., and J.J. then sat with Blanca on the couch and played with Blanca's phone. After a few moments, J.J. left to go to the bathroom, and when she returned she said, "My colita is hurting." According to Blanca, in their home they used that word to mean "vagina." Blanca asked E.J. to go to her room.

Blanca then questioned J.J. about why her colita hurt. At first, J.J. did not want to talk further, and said, "Mommy, you're going to be upset," but Blanca reassured her she would take care of her and would not be upset. J.J. said that she went to defendant's room, where defendant asked if she wanted to sit on his lap and then put his hand into her pants, but not under her

4

underwear, and "tickle[d]" her vagina until she told him to stop.[4] J.J. told Blanca that defendant had used two fingers, and she described how defendant touched her. Blanca started crying, and J.J. tried to comfort her. E.J. was not present for this conversation.

A short time later, Blanca went over to the Martinez house, and told Rosa what J.J. had told her. When Blanca returned home, she was met by E.J., who immediately informed her that defendant had grabbed her "colita" when she was between six and eight years old. Blanca asked her why she had not told her sooner, and E.J. said, "I was confused." Blanca returned to the Martinez house and told defendant's parents what E.J. had told her.

### 3. *J.J. Is Examined by Nurse Carolyn Clark*

The next day, August 6, 2018, Blanca took E.J. and J.J. to the hospital. A sexual assault exam was conducted on J.J. by registered nurse Carolyn Clark at Pomona Valley Medical Center's Sexual Assault Response Team room; Clark followed a standard protocol and documented the examination on a standardized state form; Clark is a specialist who had conducted hundreds of such examinations. Clark took genital and anal photographs. On one of the photos, she observed a white line on a part of the vagina known as the posterior fourchette; she thought the white line could have been a labial adhesion, which is a normal childhood variant, a small healing tear, or linea

---

[4] J.J. said she went to "Junior's room"; Blanca asked J.J. which "Junior," and J.J. said it was the one from Nina [Rosa Martinez], "the big one." One of E.J.'s and J.J.'s brothers, Antonio, is also known as "Junior."

5

vestibularis. When she examined the area, she detected a small tear, "like a chip of skin taken out." This tear could have been caused by the type of rubbing J.J. had described. The tear was abnormal and would cause pain during urination. There were no anal injuries. J.J.'s skin in the posterior fourchette split a little during the examination; this sometimes happens if the tissue is already weakened; also, a six-year-old girl is less estrogenized than a woman, making the vaginal/genital area less stretchy. During the examination, J.J. reported that it hurt when she used the restroom. Other than a tear of the skin, a urinary tract infection can make it painful to urinate.

Blanca, E.J., and J.J. also spoke to the police at the hospital.

### 4. *E.J. Testifies*

E.J. testified as follows. On August 5, 2018, she and J.J. were at the Martinez house to have pizza. Defendant, his parents, his sister Andrea, and his brother Chris were there; E.J. could not remember if defendant's sister Tiffany was there. Defendant tickled E.J., causing her to wet herself. Defendant often tickled her, and she enjoyed it. She went home to change. Blanca asked E.J. where J.J. was. E.J. responded that she had just come home to change and would go back to get J.J. When she returned to the Martinez house, E.J. saw J.J. and defendant emerge from defendant's bedroom.

Once E.J. and J.J. returned home, J.J. said she needed to talk to their mother, and their mother told E.J. to leave the room. E.J. could not hear their conversation and did not know what it was about. Later, she noticed her mother crying and walking back and forth between the two houses and talking with her uncle, who lived with them. When her mother returned to the

6

house, E.J. told her that defendant had touched her in the past. She did not know what had happened to J.J., but she "had a feeling" that she should tell her mother about the time defendant had touched her.

E.J. then testified that she had been abused by defendant when she was about J.J.'s current age (seven). She had gone over to the Martinez house and only defendant was there. Defendant was carrying her and she was "kind of like falling asleep"; she was not asleep but her eyes were closed. Her head was on defendant's shoulder, and he was holding her from her butt. She felt defendant's hands going under her shorts and under her underwear. When she felt defendant feeling around, she moved and opened her eyes, and defendant froze. E.J. testified that "then that's when, like, I just kind of stopped too because I didn't know what was going on, and then he kept feeling around after that." Defendant started feeling around again a few seconds after he froze and he moved his hand away a few seconds later. E.J. felt defendant's finger in her butt, moving front to back; she was not sure if it went in but she felt some pressure and pain in her butt. After defendant moved his hand away, he let E.J. down. E.J. watched defendant wash his hands, she asked him why and he said "just because," and then she went home. Even though her mother had asked her to tell her if anyone ever touched her private parts, E.J. did not promptly report the incident because she did not really understand what had happened.

On cross-examination, E.J. stated that the incident where defendant touched her could have happened when she was six, seven, eight or nine years old. Between that touching and August 5, 2018, E.J. slept over at defendant's home.

7

### 5.    *J.J. Testifies*

J.J. testified at trial as follows.  J.J. knew she was in court because someone had touched her, and she identified defendant as the person who did it.  When asked where defendant had touched her, she could not respond because she claimed she did not know the names of body parts.  She then demonstrated that he had touched her vaginal area and described it as "[w]here I pee."  She explained that defendant touched her when she was in his room watching him play video games.  She was on defendant's lap.  She demonstrated how defendant touched her by using her index finger to rub the table in front of her from side to side.  Defendant put his hand or finger inside of her underwear, in the front.  The touching made her feel uncomfortable.  She told him to stop, and he stopped.

J.J. then went home; at home she went to the bathroom and it burned when she urinated.  She told her mother it hurt when she peed.  She said she could not really remember what she told her mother after that, and did not remember going to the hospital, being examined, or talking to the police.

On cross-examination, J.J. responded "No" when asked if she remembered the touching well.  She then acknowledged that she had earlier said she did not remember the touching, and had spoken with the prosecutor, which helped her remember.[5]  On re-

---

[5] J.J.'s specific testimony was as follows:
"Q    But earlier did you ever say you didn't remember?
"A    Well, my lawyer talked to me.
"Q    After that, did it help you remember?
"A    Yes.
"Q    Okay.  If you didn't talk to her, would you be able to remember well?

8

direct examination, J.J. again acknowledged she had earlier said she did not remember, and explained she said that because she was nervous. She also said that she felt more comfortable testifying with her aunt as a support person instead of the support dog she had earlier, and because she had a stuffed animal with her.

6.  *Dr. Jayme Jones Testifies Regarding CSAAS*

Dr. Jayme Jones, a clinical psychologist, testified regarding CSAAS. Dr. Jones uses the term "model" instead of "syndrome," because the latter term is commonly used to mean that a diagnosis can be given; she described CSAAS as "a model to help understand the behavior of children who have been abused." She summarized the five components of CSAAS as follows: "There are two parts of the model that have to do with the context in which abuse occurs. The third part of the model is called accommodation and talks about the ways that children cope with ongoing abuse. The last two parts of the model, delayed disclosure and retraction, address disclosure patterns in children who have been abused."

The first element is secrecy, which refers to the fact that child sexual abuse commonly occurs when no witnesses are present. Dr. Jones explained that "[t]he fact that it is happening in secret without other people aware is an unspoken message to

---

"A      Maybe. What was the question again?
"Q      If you didn't talk to your lawyer, would you have been able to remember so well?
"A      No."
Defense counsel's question to J.J. about her not remembering "earlier" was likely a reference to a hearing held earlier that day outside the presence of the jury.

9

the child that they are not supposed to talk about it."  Also, the victim is often expressly or impliedly told to keep the incident a secret.

The second element, helplessness, refers to the size disparity between abuser and child, the child's lack of resources to avoid or escape the situation, and the fact children are often taught to listen to adults even if what they are saying does not make sense.

As to the third element, accommodation, Dr. Jones stated: "So most people's expectation is, if a child were abused, they would fight back.  They would immediately say something.  The reality is they rarely fight back.  They often freeze or pretend to be asleep, and the exception is to say something."  Such a response sometimes is explained by the fact that the child simply does not fully understand what is going on.

The fourth element is delayed or unconvincing disclosure, which refers to the fact that child victims commonly do not report their abuse until long after the fact or report a little bit at a time. It is also common for child victims to make a limited disclosure to test the listener's response.  The "most common disclosure" is for a child to say they do not like a specific person, and then provide more information depending on the initial response.

Dr. Jones stated that "children disclose for a variety of reasons, most often they don't unless something happens.  So if they are in pain, if they are worried about a sibling being abused, if they no longer have contact with the person abusing them and now feels safe, there is often, when people disclose, a triggering event."  She testified it is common for victims to continue associating with their abuser because they genuinely like other aspects of the relationship, because they believe the abuse will

not recur, or because they do not want to risk upsetting their environment.

The fifth element of CSAAS, retraction, is common if something negative occurs after disclosure; an example is that a child may retract if they believe it might end an ongoing court process. Stuffed animals or comfort animals can help the child discuss the abuse in court.

Dr. Jones explained that it is unusual for children to remember specific dates and times unless otherwise significant, such as a birthday.

Dr. Jones agreed that part of the purpose of the model is to dispel common misperceptions about how children react to sexual abuse. She also agreed that she was not in court to opine if any abuse had occurred.

On cross-examination, Dr. Jones agreed that sometimes parents or other people in the child's household steer the child to accuse someone, and she indicated this occurs in divorce cases. Dr. Jones also stated that, in general, children can be known to lie, and they often tell lies to get out of trouble.

> 7. *The Jury Hears Forensic Interviews of E.J. and J.J.*

Pomona Police Detective Matt Childers, who handled the investigation, testified. On August 15, 2018, Childers took E.J. and J.J. for forensic interviews at the Children's Advocacy Center (CAC). As described by Childers, "a forensic interview is an interview done by a professional interviewer who specializes in interviewing children who have been victims of child abuse or sexual abuse. The interview is designed to be non-leading and to gain factual information about the case from the children to be used for court purposes, and it's also recorded."

11

At CAC, E.J. and J.J. were interviewed by Susy Flores and the interviews were video-recorded. The video recordings of the interviews were played at trial.[6]

During her interview, E.J. talked about two separate occasions. On one occasion when she was about J.J.'s age, defendant carried her while she closed her eyes but she did not go to sleep. Defendant put his finger into her underwear. E.J.'s head was on defendant's shoulder, and he was carrying her by her bottom. Defendant stopped and froze when E.J. moved a bit, and then started touching her again until she said she needed to use the bathroom and went home. She said it hurt inside of her bottom.

E.J. also said that defendant would grab her and sit her on his lap, and she could feel his "boy private part." She said it felt "weird," and that "[i]t felt like there was like a ball or something." E.J. said that she would get up and defendant would just place her on his lap again.

During her interview, J.J. first disclosed that her uncle hit her with a belt because she called him dad, but he did not hit her "that rough." When Flores asked what J.J. had talked to the police about, her responses were vague and confusing and she repeatedly claimed not to remember. After much questioning, J.J. said that defendant had touched her on her body, but she was then evasive, claiming she could not describe the body part he had touched, and saying she had already told her mom and the police. She asked, "Are we almost done?" and said she was hungry and thirsty. She was evasive when Flores asked her to

---

[6] All of the People's exhibits were received into evidence without objection.

draw on a picture of a girl's body where defendant had touched her.

### 8. *The Jury Hears Excerpts from an Interrogation of Defendant*

The jury also heard evidence regarding what defendant said during an interview Childers conducted as part of his investigation. Childers testified that defendant admitted during the interview that he had J.J. on his lap on August 5, 2018. Childers also testified that, at first, defendant said he only carried E.J. and J.J. under their armpits, but he then stated he carried them by their waists sometimes and he also acknowledged that his hand could have touched E.J.'s butt. Childers's interview of defendant was video-recorded, and excerpts of the recording were played for the jurors. Later in the interview, defendant acknowledged he might have touched E.J.'s and J.J.'s buttocks accidentally while picking them up, but denied ever inserting his finger or touching their private parts intentionally or that his finger ever went "into" E.J.'s butt.[7] According to defendant, E.J. often wanted to sit in his lap and to have him pick her up.

---

[7] The excerpts initially shown to the jury included defendant's statement he "may" have touched E.J.'s butt, but did not include the question he was responding to or other portions of his response in which he denied that he touched E.J.'s butt intentionally or that he put his finger "into" E.J.'s butt, either intentionally or accidentally. At the court's direction, defense counsel refreshed Childers's recollection with a transcript of the additional portions of the interview, and later an audio recording of the additional portions was played for the jury.

**B.** *Defense Case*

    1.    *Nurse Nicole Yadon*

Nicole Yadon, a forensic nurse who had performed many sexual assault examinations, testified regarding her review of Clark's physical examination of J.J. She stated that the documentation prepared by Clark should have noted any injury caused during the examination. On a photograph taken by Clark of J.J., Yadon saw what looked like a tear or cut or laceration. Yadon disagreed with Clark's interpretation of the white line on one of the photographs, concluding it showed an area of lighter tissue. She did not believe that the lighter tissue was in the same area as the injury shown on other photographs. Yadon opined that it would be unusual to find a healing injury only a day after the injury occurred. Yadon opined that it was possible the injuries shown on the photographs occurred during the examination. She also opined it was possible the apparent wound could have been caused in some other way, such as rubbing by a person or the child's clothing, "vigorous wiping when using the restroom," or poor hygiene. She stated that a urinary tract infection could cause burning during urination.

    2.    *Rosa Martinez*

Defendant's mother Rosa Martinez testified that she did not allow E.J. and J.J. to play with defendant, and they were always with her at the house. She never saw defendant inappropriately touch E.J. or J.J. J.J. would have defendant pick her up sometimes. She saw E.J. and J.J. sometimes go into defendant's bedroom but he would tell them to leave, and it was the house rule that the girls should not go into that room.

Rosa testified that she left work on August 5, 2018, at around 6:00 p.m. She testified to a different version of what

14

happened that evening than did Blanca, stating that she and Blanca ate tacos at a restaurant, while the Martinez children and E.J. were at the Martinez house, and after she and Blanca returned they sat and talked in her kitchen until 11:30 p.m. According to Rosa, at that time J.J. was not at the Martinez house, and defendant was in his room with the door closed. At some point J.J. came over and said she was hungry, and Blanca left with J.J. Blanca came back 20 minutes later; she was crying and she told Rosa she wanted to talk.

Rosa saw E.J. and J.J. on defendant's lap on occasion; defendant would take them off, but J.J. was stubborn and wanted to play with defendant.

### 3. *Andrea Martinez*

Defendant's sister Andrea Martinez, who was 15 years old in 2018, testified that on the day in question, she and her family and E.J. bought pizza at Costco and brought it back to the Martinez house; while they were eating J.J. came over. She never saw defendant touch E.J. or J.J. inappropriately. She stated that defendant was trustworthy around children.

### 4. *Jesse Martinez, Sr.*

Defendant's father Jesse Martinez, Sr. authenticated photographs of his house, and stated that it was a small house. On August 5, 2018, at around 5:30 p.m., Jesse, Sr. went with his daughter Andrea and E.J. to Costco to buy pizza and they brought it back to the house. When they returned, only defendant and his brother Christopher Martinez were at the house. While they were eating J.J. came over. After eating, E.J. and J.J. played with Andrea in the living room; at some point E.J. went home to get her tablet, and when she returned about five minutes later she told J.J. they needed to go home because

15

they were going to buy school supplies. E.J. and J.J. went home and Jesse, Sr. did not see them again that day. Jesse, Sr. testified he did not see E.J. or J.J. go into defendant's room that day. He believed that defendant was trustworthy around children. He recalled that defendant did tickle E.J. and J.J. on occasion, and the girls sought out such attention.

### 5. *Christopher Martinez*

Defendant's brother Christopher Martinez testified he never saw defendant touch E.J. or J.J. inappropriately.

### 6. *Tiffany Martinez*

Defendant's sister Tiffany Martinez testified that E.J. and J.J. visited the Martinez house often and never showed any fear of defendant, and would hug him. She never saw E.J. or J.J. go into defendant's room; they would knock on the door and he would say he was busy. She never saw defendant touch E.J. or J.J. inappropriately. She considered defendant to be trustworthy around children. On August 5, 2018, Tiffany was at the Martinez house until about 3:00 p.m. or 4:00 p.m. and returned between 11:00 p.m. and midnight.

### C. *Jury Instruction on CSAAS*

At the close of evidence, the court instructed the jury regarding Dr. Jones' testimony about CSAAS; this version on the instruction only referred to E.J.[8] After the jury was excused, the

---

[8] The instruction stated: "You have heard testimony from Jayme Jones regarding child sexual abuse accommodation syndrome. Jayme Jones's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the charged crimes against him or any conduct or crimes with which he was not charged. You may consider this

16

prosecutor informed the court the People intended for the CSAAS testimony to apply to J.J. as well. After considering the issue, the court indicated it was inclined to have the instruction apply to J.J. as well, noting the "forensic interview in which she reluctantly, quite frankly, refused to, again, discuss the issues regarding the touching that she had earlier disclosed to her mother." The court also later referenced defense counsel's cross-examination of J.J. based on her remembering the abuse after speaking with the prosecutor. Defense counsel objected, arguing that CSAAS did not apply to J.J. because she disclosed "right away." The prosecutor argued that J.J. did not immediately disclose, and instead only did so when her mother talked to her after she complained it hurt when she went to the bathroom.

The court overruled the defense objection, concluding "it's fair game to argue [J.J.'s] subsequent behavior beyond the initial disclosure in explaining to the jury why there was so much reluctance on her part to, again, discuss those issues." The jury was subsequently instructed under a modified version of CALCRIM No. 1193 (Testimony on Child Sexual Abuse Accommodation Syndrome) as to both E.J. and J.J.

## III. Conviction and Sentencing

The jury convicted defendant on all three counts. As to counts 2 and 3, the jury found true the multiple victim allegation (§ 667.61, subd. (e)(4)).

The trial court denied defendant's motion for a new trial.

---

evidence only in deciding whether or not [E.J.'s] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

17

The court sentenced defendant to 15 years to life in state prison as to count 1, imposed a concurrent sentence as to count 2, and stayed the sentence as to count 3 under section 654.

Defendant filed a notice of appeal before he was sentenced, but we treat the notice as filed immediately after rendition of judgment. (See Cal. Rules of Court, rule 8.308(c) ["A notice of appeal filed before the judgment is rendered or the order is made is premature, but the reviewing court may treat the notice as filed immediately after the rendition of judgment or the making of the order"].)

## DISCUSSION

### I.  Substantial Evidence Supports the Conviction on Count 3

Defendant contends that his conviction on count 3 for a lewd act on E.J. is based on constitutionally insufficient evidence. We conclude there was constitutionally sufficient evidence to support defendant's conviction on count 3 under two separate factual theories.

#### A.  *Legal Principles and Standard of Review*

Section 288, subdivision (a) prohibits "willfully and lewdly commit[ing] any lewd or lascivious act" on the body of a child under the age of 14, "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." " '*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404, quoting *People v. Lopez* (1988) 19 Cal.4th 282, 289.) " '[T]he trier of fact looks to all

18

the circumstances, including the charged act, to determine whether it was performed with the required specific intent.' [Citations.]  Other relevant factors can include the defendant's extrajudicial statements [citation], other acts of lewd conduct admitted or charged in the case [citations], the relationship of the parties [citation], and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection [citation]." (*People v. Martinez* (1995) 11 Cal.4th 434, 445.)

A claim of constitutionally insufficient evidence must be rejected if substantial evidence supports the verdict.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [99 S.Ct. 2781, 61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)

In reviewing the sufficiency of the evidence under the substantial evidence standard, an appellate court does not " ' "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.]  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1262, italics omitted.)

"In determining whether evidence is sufficient to support a verdict, we examine the entire record, viewing the evidence in the light most favorable to the judgment and presuming in support of the verdict the existence of every fact the jury could reasonably deduce from the evidence.  The issue is whether the record so viewed discloses evidence that is reasonable, credible and of solid value such that a rational trier of fact could find the elements of the crime beyond a reasonable doubt." (*People v. Llamas* (1997) 51 Cal.App.4th 1729, 1736.)  " 'A reviewing court neither

19

reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

**B.    *Analysis***

Defendant contends "[t]he sole factual basis for [the] conviction on count 3 was [E.J.] telling the forensic interviewer that she felt [defendant's] 'boy private part' while sitting on his lap, 'like about sitting on a ball.' " This is not accurate. In fact, the jury was presented with two factual theories on which to find defendant guilty on count 3. The prosecutor argued that count 3 could be based on a second touching that occurred when defendant was holding E.J. and she feigned sleep or the incident where E.J. was on defendant's lap and felt his penis.[9]

It cannot be determined which ground the jury relied upon.[10] In this situation, if there is sufficient evidence to support either ground, then there is sufficient evidence supporting the conviction. (*People v. Marks* (2003) 31 Cal.4th 197, 233 ["Where

---

[9] The court instructed the jury that "[t]he People have presented evidence of more than one act to prove" count 3, and that the jury could only convict on this count if they agreed that defendant had committed at least one of the acts and they agreed which act.

[10] The trial court stayed the sentence on count 3 pursuant to section 654 "because it contains the same—essentially, based upon the same acts, the same victim, and the same time frame that supported the conviction of the defendant in count [1]." The parties debate what this ruling suggests about what the trial court believed was the precise factual basis for the jury's finding on count 3, but this is irrelevant because there is no dispositive indication in the record what the jury actually found was the basis for its verdict on count 3.

the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground"]; accord, *People v. Guiton* (1993) 4 Cal.4th 1116, 1128-1129; *People v. Llamas, supra*, 51 Cal.App.4th at p. 1740.)

We conclude substantial evidence supports defendant's conviction on count 3 under the theory that, when defendant carried E.J. and put his hand under her shorts and underpants, he touched her twice, once satisfying the elements of a "penetration" in violation of section 288.7, subdivision (b)[11] and a second time satisfying the elements for lewd conduct under section 288, subdivision (a). (See *People v. Scott* (1994) 9 Cal.4th 331, 346-347 ["Each individual act that meets the requirements of [§] 288 can result in a 'new and separate' statutory violation"], quoting *People v. Harrison* (1989) 48 Cal.3d 321, 329.) First, there is substantial evidence that defendant touched E.J. twice under her underpants in the area of her vagina and anus. E.J. testified that when she felt defendant feeling around under her underwear, she moved and opened her eyes, and defendant froze and "then that's when, like, I just kind of stopped too because I didn't know what was going on, *and then he kept feeling around after that*." (Italics added.) She later stated that defendant started feeling around again a few seconds after he froze. E.J. also described during her forensic interview that defendant

---

[11] This is the basis for defendant's conviction on count 1. Defendant does not challenge the sufficiency of the evidence on count 1.

stopped and froze when E.J. moved a bit, and then started touching her again.

There is also substantial evidence that defendant acted with lewd intent. Under *People v. Martinez, supra,* 11 Cal.4th at page 445, lewd intent can be inferred from " 'all the circumstances, including the charged act,' . . . other acts of lewd conduct admitted or charged in the case [citations], . . . and any coercion, bribery, or deceit used to obtain the victim's cooperation or avoid detection [citation]." Here, the jury could infer from the act itself, based on where defendant touched E.J., that he acted with lewd intent. In addition, the jury could infer that defendant sought to avoid detection by touching E.J. while he thought she was asleep. Finally, the jury could infer defendant's lewd intent from his similar conduct with J.J.

We also conclude there was substantial evidence supporting defendant's conviction on count 3 under the theory he put E.J. on his lap and she could feel his penis. During the forensic interview, E.J. stated that defendant would grab her and sit her on his lap, and she could feel his penis ("boy private part"). E.J. also stated that she would get up and defendant would just place her on his lap again. She described the experience as follows: "It felt weird. It felt like there was like a ball or something. Like about sitting on a ball." The jury could reasonably conclude from this evidence that defendant placed E.J. on his lap and held her there, and that she could feel his penis. Combined with the evidence that defendant had felt around under E.J.'s underwear on a different occasion, and that he had touched J.J. in her vagina as well, the jury could reasonably find beyond a reasonable doubt that defendant lewdly

touched E.J. when he held her on his lap and she could feel his penis.

In conclusion, there was substantial evidence supporting defendant's conviction on count 3.

## II. The Superior Court Did Not Err in Admitting Expert Testimony Regarding CSAAS

### A. *Law Governing Admission of CSAAS Evidence*

In *People v. Bledsoe* (1984) 36 Cal.3d 236, 251, the California Supreme Court held that expert testimony regarding "rape trauma syndrome," which explains some common stress reactions of rape victims such as delaying in reporting the rape, is inadmissible to prove that a complaining witness has, in fact, been raped. The court noted, however, that "[i]n a number of the cases in which the issue has arisen, the alleged rapist has suggested to the jury that some conduct of the victim after the incident—for example, a delay in reporting the sexual assault—is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault. [Citations.]" (*Id.* at p. 247.) The court implicitly endorsed this use of expert testimony regarding rape trauma syndrome, stating "[a]s a number of decisions have recognized, in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*Id.* at pp. 247-248.)

In *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*), the Supreme Court noted that several Courts of

Appeal had applied *Bledsoe* to expert testimony on CSAAS, which concerns "common stress reactions of children who have been sexually molested . . . which also may include the child's failure to report, or delay in reporting, the abuse."[12]  The court summarized the holdings as establishing the rule that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, at p. 1300, citing *People v. Bowker* (1988) 203 Cal.App.3d 385, 390-394 (*Bowker*), *People v. Gray* (1986) 187 Cal.App.3d 213, 217-220 (*Gray*), and *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1097-1100.)

The court in *Bowker* identified the critical issue in admitting CSAAS evidence as follows:  "It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child having been molested.  It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused.  The former may be appropriate in some circumstances; the latter . . . clearly is not." (*Bowker*, *supra*, 203 Cal.App.3d at p. 393.)

---

[12] In *McAlpin*, the court, analogizing to rape trauma syndrome and CSAAS, held that expert witness testimony explaining why a parent might fail to report that their child has been sexually abused was admissible.  (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.)

24

This rule allowing CSAAS evidence to counter a jury's misconceptions about how a minor might react to being sexually abused has been consistently applied by the Courts of Appeal. Recently, in *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171, the court held that "[t]rial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. [Citation.] While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. [Citations.]" In *People v. Munch* (2020) 52 Cal.App.5th 464, 466 (*Munch*), the court rejected a broad challenge to the use of CSAAS evidence and concluded that "CSAAS evidence is a valid and necessary component of the prosecution case in matters involving child abuse."

In *Bowker*, the court held that "the evidence [regarding CSAAS] must be targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*Bowker*, *supra*, 203 Cal.App.3d at pp. 393-394.) "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation. [Citations.]" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745.

In *Patino*, the court concluded that the prosecution was properly allowed to introduce CSAAS testimony where it "was offered for the limited purpose of explaining why [the complaining witness] did not immediately inform anyone of her molestation and why she slowly revealed the details of the

molestation." (*People v. Patino*, *supra*, 26 Cal.App.4th at p. 1745.) The court also noted that "the [defendant] did place at issue [the complaining witness's] credibility" when defense counsel asked the complaining witness on cross-examination how long it took for her to notify authorities about the abuse and why she returned to the defendant's house after being molested. (*Ibid*.)

In *Gray*, the court held that expert testimony by a child psychologist regarding CSAAS was properly admitted "after [the complaining witness] testified she did not tell anyone about touching [the defendant's] penis except in response to [the detective's] questioning, she did not tell anyone until she testified in court that [the defendant] said, at the time, 'it won't bite you', and she told her mother she might have been incorrect about some incidents but agreed with her father because she feared his anger." (*Gray*, *supra*, 187 Cal.App.3d at p. 218.) The court noted that "[t]hrough cross-examination of [the complaining witness] and other witnesses, [the defendant] suggested that the delay in reporting the alleged molestation and failure to disclose all incidents when she finally told her stepmother was inconsistent with her claim of molestation." (*Ibid*.) The psychologist testified "that delayed reporting and inconsistency is not unusual with victims of child molestation . . . and explained what causes children to react differently to molestation than adults might expect." (*Ibid*.; see *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 [CSAAS evidence admissible based on cross-examination in which defense counsel "attacked the victim's credibility by attempting to show that he had made inconsistent statements and had delayed in reporting the molestation"].)

In *Bowker*, the court also held that "the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Bowker, supra*, 203 Cal.App.3d at p. 394.) A standard instruction has been developed for this purpose. (See CALCRIM No. 1193; see also *Munch, supra*, 52 Cal.App.5th at p. 474 [rejecting challenge to CALCRIM No. 1193]; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504 [same].)

## B. *Defendant's General Challenge to Expert Testimony Regarding CSAAS*

Defendant acknowledges that, under *McAlpin, supra*, 53 Cal.3d 1289, some evidence regarding CSAAS has been admissible in child sexual abuse prosecutions, but suggests we should scrutinize the underpinnings of CSAAS testimony because it has been criticized in the scientific community and courts in other states, most notably the Supreme Court of New Jersey in *State v. J.L.G.* (N.J. 2018) 190 A.3d 442 (*J.L.G.*). After reviewing scientific literature, the court in *J.L.G.* held that only the factor of delayed disclosure had the kind of "consistent and long-standing support in the scientific literature and among experts" that permitted admission into evidence: "[n]one of the other features that comprise CSAAS have achieved sufficient acceptance in the scientific community to be considered reliable evidence . . . ." (*Id.* at p. 464.) "Nor is it sufficient for the State to claim that expert evidence is being admitted only to educate jurors and dispel misconceptions, and not as a diagnostic or predictive tool. The underlying claims of the syndrome must themselves be reliable to be admitted . . . ." (*Ibid.*)

27

Division Six of this court recently rejected a similar argument in *Munch*, *supra*, 52 Cal.App.5th 464. Addressing the defendant's argument that some other jurisdictions no longer admit CSAAS evidence, the court reviewed the law of several other jurisdictions identified by the defendant—Pennsylvania, Washington, Ohio, Tennessee, and the Ninth Circuit—and concluded those jurisdictions in fact do admit CSAAS evidence. (*Id.* at pp. 469-470.) The court also thoroughly reviewed the New Jersey case defendant relies upon here, *J.L.G.*, *supra*, 190 A.3d 442, and concluded the decision "involves an aberrant view of CSAAS derived from a contested hearing where four experts testified." (*Munch*, *supra*, at p. 470.) The court noted that the New Jersey court applied a "restrictive" test for reviewing the reliability of scientific evidence, and also analyzed the *J.L.G.* court's conclusions regarding CSAAS with its own summary of scientific research and opinions. (*Munch*, *supra*, at pp. 470-471.) Concluding this portion of its opinion, the court noted that while the Kentucky Supreme Court had ruled that CSAAS is not admissible, there was disagreement among that court's justices on the issue. (*Id.* at pp. 471-472, citing *Sanderson v. Commonwealth* (Ky. 2009) 291 S.W.3d 610.)

The *Munch* court also held that the *Kelly*/*Frye* rule[13] governing reliability of new scientific evidence " 'does not apply' " to expert testimony regarding CSAAS. (*Munch*, *supra*, 52 Cal.App.5th at p. 473.) This is because testimony regarding CSAAS "is 'based on [the expert's] clinical experience with child sexual abuse victims and on [his or] her familiarity with

---

[13] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. U.S.* (D.C. Cir 1923) 293 F. 1013.

professional literature in the area.' " (*Ibid.*, quoting *People v. Harlan*, *supra*, 222 Cal.App.3d at p. 449.) Then, quoting *People v. Stoll* (1989) 49 Cal.3d 1136, 1161, the court concluded that expert testimony regarding CSAAS "meets 'traditional standards for competent expert opinion, without need for additional screening procedures [under *Kelly/Frye*].' " (*Munch*, *supra*, at p. 473; accord, *Gray*, *supra*, 187 Cal.App.3d at pp. 218-219 [expert's testimony regarding CSAAS was not subject to review under *Kelly/Frye*].)

We agree with the *Munch* court, and see no grounds for criticizing the general use of expert testimony regarding CSAAS to rehabilitate a minor complaining witness's credibility within the parameters established by the California courts.

### C. *Defendant's Contention CSAAS Evidence Was Not Relevant*

Defendant contends that CSAAS was not relevant because "there was no appreciable delay in [J.J.'s] disclosure, there was no recantation by either complainant as recognized by CSAAS, and the credibility challenges were generic: that [J.J.] was confused or dissembling as to which Junior did what, or that her misattribution was due to fear of physical abuse, that [E.J.'s] belated disclosure was prompted by misrecollection or some other external pressure, and their accounts were not lies, but attempts to point a finger in another direction."

A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) Under this standard, different aspects of the trial court's decision are subject to different levels of scrutiny. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) Specifically, a "trial court's findings of fact are reviewed for substantial evidence, its

29

conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious."[14] (*Ibid.*, fns. omitted.)

Here Dr. Jones's testimony regarding CSAAS was relevant to the credibility of both E.J. and J.J. and therefore the trial court did not abuse its discretion in admitting the evidence.

As to E.J., CSAAS evidence was relevant because she did not resist when defendant touched her even though she was aware it was occurring, she waited years before reporting the abuse, and she enjoyed going back to the Martinez home and engaging with defendant even after the abuse. Dr. Jones's testimony regarding CSAAS was relevant to rebut any misconception that this behavior by E.J. was inconsistent with

---

[14] Defense counsel did not object to the introduction of Dr. Jones's testimony regarding CSAAS. However, in his trial brief defense counsel did state his position that CSAAS evidence should "be limited to the rehabilitation of the victims' credibility," and he reiterated this point during the hearing on the parties' motions in limine. Later during that hearing, the court stated regarding CSAAS evidence, "I think the evidence is relevant, and it is admissible for the People to call this witness and elicit this information before the jury. Just for the record, it will be over defense objection."

During the trial, in discussing closing jury instructions with the court, defense counsel implicitly acknowledged that CSAAS testimony was relevant to E.J.'s credibility, but argued that it was not relevant to J.J.'s credibility. This discussion with the court regarding jury instructions was the first time defense counsel was notified that the instruction would apply to both E.J. and J.J. Given these circumstances, we will consider defendant's argument on appeal that the trial court erred in admitting CSAAS as relevant to E.J.'s and J.J.'s credibility.

30

her being abused.  For example, Dr. Jones testified that a common misperception was that a child victim would resist and promptly report being abused.  She also testified that a child might disclose only after they gained the ability to understand and express themselves, or after realizing that someone else had been victimized.

As to J.J., CSAAS evidence was relevant because she was evasive and vague during the forensic interview; she did not bring up the incident involving defendant until the interviewer asked her a direct question, and then she claimed she could not describe the body part defendant had touched.  She also was evasive when asked to draw on a diagram of a girl's body where defendant had touched her.  In addition, in cross-examining J.J., defense counsel elicited from her that she had earlier said she did not remember the abuse, and had spoken with the prosecutor, which helped her remember.  On re-direct examination, J.J. again acknowledged she had earlier said she did not remember being touched, and stated she said that because she was nervous.  Finally, J.J. did not immediately disclose the abuse, and did so only after she told her mother it hurt when she urinated, and her mother asked her questions about it.

Dr. Jones's testimony regarding CSAAS was relevant to rebut any misconception that this behavior by J.J. was inconsistent with her being abused.  For example, Dr. Jones explained that children might refuse to talk about the abuse if something negative occurs after disclosure.  As an example, she said this might occur if a child wants to end an ongoing court process.  Finally, Dr. Jones's testimony that it is common for children to delay in disclosing, and are more likely to disclose in response to specific questions, was relevant to J.J.'s credibility.

In conclusion, we find that CSAAS was relevant in this case to E.J.'s and J.J.'s credibility.

### D. *Defendant's Contention CSAAS Evidence Was Not a Proper Subject for Expert Testimony*

Defendant contends that Dr. Jones's testimony that it is common for children to delay in reporting abuse is not beyond the understanding of the common juror.

Defendant has forfeited this argument by not objecting on this ground in the trial court. A party is required to raise objections to evidence at the trial court level, or their objection is forfeited. (See Evid. Code, § 353 [defendant must make timely evidentiary objection on same ground urged on appeal]; *People v. Romero and Self* (2015) 62 Cal.4th 1, 24 [failure to object " 'deprives the trial court of the opportunity' to create a record and to 'correct potential error in the first instance' "].)

In any case, even if defendant did not forfeit this argument, it was not an abuse of discretion for the court to conclude that the elements and application of CSAAS was beyond the common understanding of jurors. Moreover, even assuming that every juror was fully aware of all aspects of CSAAS, we would find that admission of Dr. Jones's testimony was not prejudicial. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 172 [even if CSAAS was not beyond the understanding of the jurors the admission of expert testimony on the subject was cumulative and therefore not prejudicial].)

### E. *Defendant's Contention the Prosecution Asked Improper Hypothetical Questions*

Defendant argues that it was error to admit Dr. Jones's responses to hypothetical questions that "closely track[ed] the facts of the case."

Defendant has forfeited this argument because defense counsel did not object at trial.  (Evid. Code, § 353; *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 24.)  Defendant contends that it would have been futile to object, but nothing in the record supports this contention.

In any event, even if defendant did not forfeit this argument, the hypothetical questions posed to Dr. Jones by the prosecution were not improper.  "Hypothetical questions must not be prohibited solely because they track the evidence too closely, or because the questioner did not disguise the fact the questions were based on the evidence."  (*People v. Vang* (2011) 52 Cal.4th 1038, 1051.)  Defendant relies on *People v. Jeff* (1988) 204 Cal.App.3d 309, but that case is distinguishable because the testimony of the expert clinical psychologist was used to present evidence to the jury that the complaining witness showed symptoms of being abused, and thus that she had in fact been abused.  As the court summarized, the expert "in response to . . . questions, explained to the jury [the complaining witness's] emotions, fears, and reactions to others are symptoms exhibited by a child molest victim."  (*Id.* at p. 338.)  This included testimony that "most child victims have nightmares in which they dream they are hurt or killed," which followed testimony from another expert, who had counseled the complaining witness, that the complaining witness had described nightmares of being kidnapped.  (*Id.* at pp. 335-336.)

In *People v. Harlan*, *supra*, 222 Cal.App.3d at page 450, the court rejected the defendant's argument that the court erred in admitting testimony by the prosecution's CSAAS expert which incorporated circumstances mirroring the complaining witness's life, stating "[t]he testimony [the defendant] has challenged,

33

apart from that his own counsel elicited on cross-examination, related directly to the popular misconception about delayed disclosure. We find no error in the admission of such testimony." The same is true in this case. The hypothetical questions posed by the prosecutor concerned the circumstances of disclosure of abuse and children claiming not to remember abuse even after having previously disclosed, which relate to common misconceptions of the behavior of children who have been abused.

Finally, even assuming it was error to allow Dr. Jones's response to the prosecutor's hypothetical questions, we would find that the error was not prejudicial. (*People v. Watson, supra,* 46 Cal.2d at p. 836; see *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 [erroneous admission of expert testimony that "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth" was subject to analysis under state law, and error was harmless]; *Bowker, supra,* 203 Cal.App.3d at p. 395 [improper admission of expert's CSAAS testimony that went beyond rehabilitating the complaining witness's credibility was harmless].)

### F. *Defendant's Contention the Court Improperly Allowed Testimony that Having a Stuffed Animal or Comfort Dog Could Put a Child Witness at Ease*

Defendant contends that it was improper for the CSAAS expert witness to testify that stuffed animals and comfort animals can help a child discuss the abuse they suffered, when combined with the fact that J.J. took a stuffed animal to the stand and E.J. was accompanied to the stand by a dog.

34

Defendant has forfeited this argument because defense counsel did not object at trial. (Evid. Code, § 353; *People v. Romero and Self*, *supra*, 62 Cal.4th at p. 24.)

Even if defendant did not forfeit this argument, there was no error. Dr. Jones opined that using a stuffed animal or comfort dog could make it easier for a child to talk about abuse. This opinion was relevant to rehabilitate J.J.'s credibility after she admitted saying previously that she did not remember the abuse and that she was able to remember after speaking with the prosecutor. On re-direct, J.J. brought a stuffed animal with her and testified that she said she did not remember because she was nervous, and having the stuffed animal with her made her feel more comfortable testifying.

Finally, even assuming it was error to allow Dr. Jones's testimony regarding the use of stuffed animals or comfort dogs, we would find that the error was not prejudicial. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## III. The Superior Court Did Not Apply an Incorrect Standard in Deciding Appellant's Motion for a New Trial

Defendant contends that the trial court abused its discretion in ruling on his motion for a new trial under section 1181 because it failed to apply the correct standard of independent review.

### A. *Legal Principles and Standard of Review*

Section 1181, subdivision (6) provides that "the court may, upon [a defendant's] application, grant a new trial" "[w]hen the verdict or finding is contrary to law or evidence."

"In reviewing a motion for a new trial, the trial court must weigh the evidence independently. [Citation.] It is, however,

guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.] [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 523-524; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 729-730 [quoting *Davis*].)

### B.   *Analysis*

In announcing its ruling on defendant's motion for a new trial, the court articulated the applicable standard, stating, "I acknowledge that this court does have the authority as being a 13th juror to re-review sufficiency of the evidence to make an independent finding as to whether or not these charges have been proven beyond a reasonable doubt in terms of consideration of a motion for a new trial." Defendant nonetheless contends that the court did not apply this standard, and gave "undue deference" to the jury's verdict, as evidenced by several comments made by the court, such as "I can't give—see a means for the court to interfere with that jury's responsibility in rendering the verdict because they did, in fact, hear the inconsistencies and the conflicts that the defense has raised in their motions, and they were given a fair opportunity to evaluate it."

36

We conclude that the trial court did not abuse its discretion in denying defendant's motion for new trial. The trial court articulated the correct standard, noting that it was required to review the evidence independently. The trial court's statements that it did not see how it could "interfere" with the jury's verdict do not show that it applied an incorrect standard. The court's statements simply suggest it was not convinced by the points raised in defendant's motion, and concluded there was sufficient evidence supporting the verdict. Moreover, under the applicable standard the court was properly "guided by a presumption in favor of the correctness of the verdict." (*People v. Davis*, *supra*, 10 Cal.4th at p. 524.) Defendant relies on *People v. Watts* (2018) 22 Cal.App.5th 102, but in that case "the court repeatedly informed [the defendant] it could not reweigh the evidence and that its only concern was whether the prosecution had presented sufficient evidence to present the matter to the jury." (*Id.* at p. 113.)

In conclusion, we do not find any " ' "manifest and unmistakable abuse of discretion" ' " by the trial court in denying defendant's motion for a new trial. (*People v. Davis*, *supra*, 10 Cal.4th at p. 524.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

                                                            BENKE, J.*

We concur:


        CHANEY, J.


        BENDIX, Acting P. J.

---

        * Retired Associate Justice of the Court of Appeal, Fourth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.